******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DANIEL B.*
(AC 36418)

DiPentima, C. J., and Beach and Bishop, Js.

*Argued November 16, 2015—officially released April 5, 2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, White, J. [motion for disclosure];
Hudock, J. [motion to preclude; judgment].)

*A. Paul Spinella*, with whom were *Philip Russell*
and, on the brief, *Caitlin Trow*, for the appellant
(defendant).

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *David I. Cohen*, state's
attorney, and *Maureen Ornousky*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Daniel B., appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a. On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the trial court unduly restricted his access to certain information regarding a confidential informant who testified at trial, (3) the court improperly limited the cross-examination of a witness by the defendant, and (4) the court provided improper instructions in its jury charge. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant married the victim in 2005. By late 2009, the marriage had begun to deteriorate. Approximately one year later, the defendant filed for divorce. During the relevant period, the defendant and the victim lived in the same residence in Stamford.

On June 9, 2011, the defendant called John Evans, a childhood friend, to arrange a meeting. At approximately 3 p.m., the defendant and Evans met in a Dunkin Donuts. At the outset of the meeting, the defendant asked Evans if he "knew anybody that could murder his wife as a hit man." The defendant told Evans that he was getting a divorce and explained that his wife was "getting the house, the kids . . . and . . . trying to get some money . . . ." Although Evans tried to dissuade him, the defendant stated that had been "thinking about it for two years, and he [had] made up his mind . . . [that] he needs [his wife murdered] . . . before his next court date." The meeting concluded with Evans agreeing to "talk to a couple of people in New York and . . . see if [he] could arrange [a meeting with a hit man]."On the same day, Evans called John Evensen, a retired Stamford police officer.[1] Evans told Evensen that the defendant had requested that he find a hit man; Evensen urged Evans to "do the right thing" because it was "somebody's life." Evensen then told Evans that he would call someone to "see what he could do."

Later that evening, Evensen telephoned James Matheny, then commander of the bureau of criminal investigations of the Stamford Police Department, to convey the information provided by Evans. Matheny then spoke with Evans directly. After this conversation, Matheny developed a plan in which the defendant would meet with an undercover police officer feigning to be a hit man. As part of the plan, Evans called the defendant to inform him that he had found a hit man from New York who wanted to speak with him that night. The defendant agreed to meet with the purported hit man, who was in fact Officer Michael Paleski, Jr., of the Branford Police Department.

The meeting between the defendant and Paleski took place at a rest stop off Interstate 95 near Darien. The plan consisted of Paleski following Evans to the rest stop in a vehicle equipped with a hidden video camera. Paleski and Evans arrived first and waited for the defendant, who arrived shortly after midnight on June 10, 2011. Evans introduced the defendant to Paleski and then returned to his car. The defendant entered Paleski's vehicle where the hidden video camera recorded the murder for hire plot. After the meeting ended and Paleski had departed, the defendant was arrested.

The defendant was charged with attempt to commit murder and violating a criminal protective order.[2] Following an eight day jury trial, the defendant was found guilty of the attempt to commit murder charge and not guilty of the violation of a protective order charge. The court sentenced him to twenty years of incarceration, suspended after fifteen years, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that there was insufficient evidence to support his conviction. Specifically, he argues that the state failed to prove that his conduct constituted a substantial step in a course of conduct intended to culminate in a murder. Thus, he claims that an essential element of § 53a-49 was not established.[3] We do not agree.

The following additional facts are relevant to this claim. The entire meeting between the defendant and Paleski lasted slightly more than sixteen minutes. During the meeting, three major points were discussed in the murder for hire plot. First, the defendant agreed to pay $10,000 for Paleski to murder his wife. The defendant also agreed to deliver $3000 as a down payment and $800 for a firearm the following morning because obtaining the money that night would create suspicion.[4] Second, when asked for information about the victim, the defendant readily provided his wife's name, home address, place of employment and work schedule,[5] as well as a photograph, explaining to Paleski that his wife's hair color was different from what was depicted in the photograph.[6]

The final point discussed at the meeting focused on the method by which Paleski was to murder the defendant's wife. The defendant had voiced his concern that he needed to be cautious in this illicit endeavor because he was "obviously the first person [that] . . . [was] going to be looked at [after his wife was murdered]." Paleski, then, explicitly asked the defendant how he wanted the murder accomplished. The defendant noted that his wife's place of employment was in a "rough section" of the city and that she drove a "nice car."

This information prompted Paleski to suggest that he could "make it look like a [carjacking] or something," to which the defendant acknowledged, "[s]omething like that . . . take the car . . . [it] is going to get [found] and it kind of like explains it." Paleski then sought clarification as to the result desired by the defendant, "[Y]ou want her completely out of the picture, right? Morte." The defendant replied, "[T]hat's where it's getting to . . . ." The defendant then suggested a Thursday as a possible day for the murder because he would be with his children at his aunts' house. Paleski concurred that he could "take the bitch off" when the defendant was with his aunts, and the defendant replied, "exactly."

The meeting concluded with the defendant and Paleski agreeing to meet the following day at 10 a.m. at the same location. The defendant iterated that, to be cautious, he was not going to use his phone. Rather, he would purchase a prepaid mobile phone to contact Paleski. After confirming the time and place of the meeting where the defendant would bring the money, the defendant thanked Paleski, exited the vehicle, and promptly was taken into custody as soon as Paleski left the rest stop.

The defendant's claim on appeal is that his conduct was not a "substantial step in a course of conduct planned to culminate in his commission" of murder. General Statutes § 53a-49 (a) (2). He argues that in Connecticut, a "substantial step" requires an overt act that "must be more than mere preparation," and such act "must be in close proximity to the actual crime and 'come pretty near' to completing the crime but for some interference." Thus, in contemplating what act constitutes a substantial step, "the focus is on what is left to be done not what has already been done." Applying this reasoning, the defendant contends that the meeting with Paleski was "merely preparatory and did not constitute a 'substantial step' toward the commission of murder." At best, the defendant argues, the meeting was a "mere solicitation, which, by itself, is never an attempt." (Internal quotation marks omitted.) We are not persuaded.

We begin by recognizing that "[a] defendant who asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Leandry*, 161 Conn. App. 379, 383, 127 A.3d 1115, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015). As to the standard of review for this claim, this court applies a two part test. "We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the verdict. . . . [Second, we] then determine whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reason-

able doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Hanks*, 39 Conn. App. 333, 338–39, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995).

The law relevant to an insufficiency of the evidence claim teaches that "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 808, 911 A.2d 1099 (2007). We, however, are mindful that "[w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Damato*, 105 Conn. App. 335, 344, 937 A.2d 1232, cert. denied, 286 Conn. 920, 949 A.2d 481 (2008).

Turning to the statutes applicable here, § 53a-54a (a) defines murder, in relevant part, as follows: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." Section 53a-49 (a) defines criminal attempt, in relevant part, as follows: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does . . . anything which, under the circumstances as he believes them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Furthermore, "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ." General Statutes § 53a-49 (b). It is noteworthy that "[w]hat constitutes a substantial step in any given case is a question of fact." (Internal quotation marks omitted.) *State* v. *Osbourne*, 138 Conn. App. 518, 528, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). Thus, in this case, to prove the defendant guilty of violating §§ 53a-49 and 53a-54a, the state had to prove beyond a reasonable doubt that the defendant,

with the intent to cause the death of his wife, committed an act that was a substantial step aimed at achieving her death.

## A

To dispose of the defendant's argument and resolve his sufficiency of the evidence claim, we must review Connecticut's criminal attempt statute. As implicitly acknowledged by the parties, our Supreme Court and this court have conflicting authority on what conduct constitutes a substantial step: specifically as to whether the focus is on "what the actor has *already done* and not on what remains to be done." (Emphasis in original.) *State* v. *Lapia*, 202 Conn. 509, 515, 522 A.2d 272 (1987).[7]

In resolving this apparent contradiction in our case law, we begin with a review of § 5.01[8] of the Model Penal Code because § 53a-49 was modeled after it. See *State* v. *Moreno-Hernandez*, 317 Conn. 292, 303, 118 A.3d 26 (2015); see also id., 304 n.5 (comparing General Statutes § 53a-49 and Model Penal Code § 5.01). Because § 53a-49 stems, in part, from the Model Penal Code, the code's comments are pertinent. See *State* v. *Servello*, 59 Conn. App. 362, 372, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000). The comments state that the Model Penal Code formulation of criminal attempt "shifts the emphasis from what remains to be done . . . to what the actor has already done." 1 A.L.I., Model Penal Code and Commentaries (1985) § 5.01, comment 6 (a), p. 329 (Model Penal Code and Commentaries). The significance, then, is that this "approach will broaden the scope of attempt liability." Id.; see also 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 11.4 (e), p. 226 ("[the Model Penal Code approach] will broaden the scope of attempt liability in a way which is consistent with the purpose of restraining dangerous persons, as: (1) the emphasis is upon what the actor has already done rather than what remains to be done; (2) liability will be imposed only if some firmness of criminal purpose is shown" [footnote omitted]).

Although conflicting decisions exist in both appellate courts, we nonetheless find support in recent Connecticut case law to frame our criminal attempt formulation in conformance with the Model Penal Code, i.e., the focus is on what the defendant has already done and not what remains to be done.[9] In *State* v. *Carter*, 317 Conn. 845, 848, 858, 120 A.3d 1229 (2015), the defendant was convicted of attempt to commit assault in the first degree for aiming a firearm at a police officer's midsection, followed by "position[ing] himself in a shooting stance and put[ting] his finger on the trigger guard." The defendant challenged the conviction by claiming that it was not established that he had the requisite intent to commit this crime. Id., 848. One of the defendant's arguments was that "there was insufficient evidence of intent because he never attempted to rack the

gun, and thus the gun would not have fired even if he had pulled the trigger." Id., 860. In disposing of this argument, our Supreme Court made the following observation: "[W]hether the gun was racked or not seems to be beyond the point. The defendant's claim that he did not rack the gun, even if true, would only support the proposition that he did not take the *next* step to complete the crime which, of course, is irrelevant to the inquiry whether he took a *prior* substantial step to commit the offense. Because the defendant was charged with attempt to commit assault, it was only necessary for him to take a substantial step under the circumstances as he believe[d] them to be . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 861. Our Supreme Court's analysis thus focused on what the defendant already had done and not what remained to be done.

Similarly, this court in *State* v. *Osbourne*, supra, 138 Conn. App. 528, explained that the standard for the substantial step element of criminal attempt "focuse[d] on what the actor has already done and not what remains to be done. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime. . . . What constitutes a substantial step in any given case is a question of fact." (Internal quotation marks omitted.) We further clarified that "[t]he ultimate measure of the sufficiency of the defendant's conduct to constitute a substantial step in a course of conduct planned to culminate in the commission of assault in the first degree is not, to reiterate, how close in time or place or final execution his proven conduct came to the consummation of that crime, but whether such conduct, if at least the start of a line of conduct leading naturally to the commission of the crime, strongly corroborated his alleged criminal purpose." Id., 530. Our reasoning in *Osbourne*, reinforced by the majority of appellate cases, our reading of *Carter*, and the Model Penal Code, support our determination that to dispose of the defendant's sufficiency of the evidence claim before us, we must focus on "what the actor has already done and not what remains to be done." (Internal quotation marks omitted.) Id., 528.

B

We now turn to the merits of the claim. The evidence before the jury included Evans' testimony and the video in which the defendant and Paleski plotted a murder for hire scheme. Through Evans, the state presented evidence that, if credited by the jury, established that the defendant sought his help to attain the services of a hit man. Furthermore, Evans testified that he tried to dissuade the defendant, but the defendant stated that he had been contemplating this course of action for "two years, and he [had] made up his mind . . . [that] he needs [his wife murdered] . . . before his next court date."

The state also presented the video recording of the meeting between the defendant and Paleski. The video allowed the jury to observe the conduct, demeanor, and attitude of the defendant as he agreed to hire Paleski to kill his wife. In a little more than one-quarter of an hour, the defendant agreed to a price (to include a down payment and money for the murder weapon), provided Paleski with key information, namely, his wife's name, home and work address, her work schedule, a description of her vehicle, and suggested a day, location, and manner for the murder to ensure that the defendant would have an alibi. Finally, the jury also saw the defendant twice confirm to Paleski that he wanted his wife murdered.

The defendant argues that because he did not pay Paleski his conduct was merely preparatory. Indeed, Paleski did state that he "can't do shit without that money." The defendant's argument, however, is flawed for two reasons. First, the substantial step standard focuses of what he has already done, i.e., agreeing to hire a hit man and providing critical information about the victim, and not what remains to be done, i.e., paying the purported hit man. See *State* v. *Osbourne*, supra, 138 Conn. App. 528. Moreover, the mere fact that the defendant did not make a payment is not dispositive. See *State* v. *Servello*, supra, 59 Conn. App. 373 ("Our Supreme Court has stated that the essential element of a hiring relationship is an agreement to compensate the [agent] for his services. . . . In interpreting the relevant section pertaining to hiring an agent to carry out a murder, we are concerned principally with adopting a construction . . . that effectuates the legislative intention, not with the technical niceties of contract law." [Citation omitted; internal quotation marks omitted.]); see also Model Penal Code and Commentaries, supra, § 5.01, comment (6) (a), p. 329 ("[t]hat further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial"). "To constitute a substantial step, however, consummation of [paying the hit man] is not required. Any other interpretation would impose a requirement of a more stringent standard of proof for attempt than is provided by § 53a-49." *State* v. *Servello*, supra, 375.

Second, what constitutes a substantial step in any given case is a question of fact; *State* v. *Osbourne*, supra, 138 Conn. App. 528; a point never addressed by the defendant. Mindful that we are not jurors and our role is limited to determining whether the jury reasonably could have concluded that the defendant took a substantial step that was strongly corroborative of his criminal purpose, we must defer to the jury's assessment of Evans' credibility and evaluation of the video. We determine that it was reasonable for the jury to have concluded that the defendant took a substantial step

in a course of conduct intended to culminate in the murder of his wife.[10]

The defendant's second argument that his conduct, at best, amounts to solicitation warrants little discussion. The state presented sufficient evidence concerning the defendant's conduct that the jury reasonably could have concluded that it constituted a substantial step. See *State* v. *Griggs*, 288 Conn. 116, 131 n.18, 951 A.2d 531 (2008) ("[a] conviction for attempted murder does not require a showing of actual injury, but only intentional conduct that constitutes a substantial step toward causing the death of another").

Reviewing the evidence in a light most favorable to sustaining the verdict, we determine that sufficient evidence existed for the jury to have reasonably concluded that the cumulative effect of Evans' testimony and the video established beyond a reasonable doubt that the defendant, with the intent to cause the death of his wife, committed a substantial step aimed at achieving his wife's death when he sought to hire a hit man, agreed to a price, provided critical information about the victim, and suggested the method by which to commit the murder to ensure his alibi. Accordingly, the defendant's first claim must fail.

II

The defendant next claims that the court, *White, J.*, abused its discretion by unduly restricting access to certain records regarding Evans' role as a confidential informant. Specifically, the defendant contends that the court should have made the confidential records available to him. We disagree.

The following procedural history is relevant to this claim. In a letter sent to the state, the defendant sought "all pertinent information pertaining to [Evans]," namely, records that detailed Evans' assistance in any investigation, a complete list of financial payments or benefits in connection with the defendant's case and any other case in which the informant was involved, and all information listing "illicit activities" and "allegations of wrongdoing" connected to Evans. Although the state objected, the court ordered the state to "confer with the Stamford Police Department and hand over, under seal, any records it has in connection with . . . Evans." The court directed that those records were to include, but not be limited to, "any financial payments made by [the] Stamford Police Department to . . . Evans in connection with his work as a [confidential informant] for the Stamford Police Department" and the supervisor's log. Upon receipt of the sealed records, the court conducted an in camera review and, at a hearing, disclosed to the defendant that "Evans worked as a [confidential informant] for the Stamford Police Department on eight occasions between . . . August of 2006 and June of 2011." The court, however, noted

that these records failed to indicate whether Evans had been paid. Therefore, the court ordered the state a second time to determine whether Evans had been paid anything, observing that "the defense is entitled to that information."

The state complied with the court's second order. The Stamford Police Department sent a letter that was reviewed in chambers and not shown to defense counsel. At the subsequent hearing, the court explained that the letter indicated that there were "no written records regarding payments made to . . . Evans over the period of time for which he worked as a [confidential informant]. . . . [T]he letter [also] indicate[d] that there were payments made to . . . Evans for gas and food. None of the payments exceeded thirty dollars. The payments [were] not broken down as to each time . . . Evans worked as an informant." Importantly, the court stated that the letter indicated that Evans "didn't receive any payment in connection with [the defendant's] case."

When the court ruled that the records were to be sealed, defense counsel objected. He wanted to question the police officers who furnished the information contained in the sealed letter. The court denied this request and noted to defense counsel that, "for most part, [the court] granted [defense counsel's disclosure] motion," which had not sought a disclosure of who were the police officers involved in the undercover operation. The court, while addressing defense counsel, summarized its ruling as follows: "You know who the person you claim is a [confidential informant], you know the person's identity. You know how often [Evans] worked with the Stamford Police Department. . . . You know something about the payments that were made . . . ."

The defendant claims on appeal that because Evans' credibility was essential to the case, the records "might [have] contain[ed] exculpatory information especially relevant to Evans' credibility." Therefore, the defendant argues, he needed full access to the confidential records. We have reviewed the sealed records, and we do not agree with the defendant.

The standard of review and principles of law that guide our analysis are well established. We review a court's decision to not release confidential records under the abuse of discretion standard. See *State* v. *Colon*, 272 Conn. 106, 256, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); see also *State* v. *Delgado*, 64 Conn. App. 312, 319, 780 A.2d 180 (2001), aff'd, 261 Conn. 708, 805 A.2d 705 (2002).

"This court has the responsibility to conduct its own in camera review of the sealed records to determine whether the trial court abused its discretion in refusing

to release those records to the defendant. . . . The linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality . . . . Whether and to what extent access to the records should be granted to protect the defendant's right of confrontation must be determined on a case by case basis." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, supra, 64 Conn. App. 319; see also *State* v. *Webb*, 75 Conn. App. 447, 458, 817 A.2d 122 (asserting that this court has responsibility to conduct its own in camera inspection of sealed records), cert. denied, 263 Conn. 919, 822 A.2d 244 (2003). "At this stage in the proceedings, when the court has reviewed the records in camera, access to the records must be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 320.

We have conducted our own in camera inspection of the sealed records. On the basis of that review, we conclude that the court did not abuse its discretion. The court properly disclosed the relevant information to the defendant, namely, that Evans had worked as a confidential informant on eight occasions, and that, although the sealed records did not list the specific past instances, Evans was previously compensated a petty amount and not compensated for his participation in the defendant's case. Moreover, the sealed records failed to contain any exculpatory evidence. Our review of the records reflects that the court properly exercised its discretion in denying the defendant access to the confidential records. See *State* v. *Kemah*, 289 Conn. 411, 436, 957 A.2d 852 (2008) ("[a] criminal defendant does not have the right to conduct a general fishing expedition into privileged or sensitive records" [internal quotation marks omitted]). Thus, the defendant's claim must fail.

### III

The defendant also argues that the court improperly limited his cross-examination of Evans regarding his relationship with certain police officers.[11] The defendant contends that this ruling violated his federal and state constitutional rights to confrontation and his right to present a defense, or, in the alternative, was an abuse of discretion resulting in harmful error. Because the defendant had sufficient opportunity to cross-examine Evans to challenge his credibility and potential bias, we reject the defendant's argument.

The following facts and procedural history are relevant here. After the court, *White, J.*, ordered certain

records regarding Evans' status as a confidential informant sealed; see part II of this opinion; the state filed a motion in limine on the eve of trial requesting certain limitations on the defendant's cross-examination of Evans. Specifically, the state sought, inter alia, that the defendant "be limited to inquire about [Evans'] contact with the Stamford police in this case alone."

On the second day of trial, the court, *Hudock, J.*, held a hearing on the state's motion. The state requested that the court have defense counsel "delineate the questions he plan[ned] to ask . . . Evans regarding his prior contact with the Stamford Police Department and rule whether or not those require him to be less specific in order for the court not to run into a conflict with the public policy interests in this case . . . ." Defense counsel stated that he sought to inquire into Evans' expectation of monetary compensation or other consideration in connection with this case. The court explicitly stated that it did not "have a problem with [defense counsel] asking about expectations . . . [or] payments."

Defense counsel also argued that the defendant's confrontation rights afforded him wider latitude in cross-examining Evans. Citing a 1977 case from the United States Court of Appeals for the Sixth Circuit[12] and its progeny, the defendant argued that because Evans was a confidential informant, he had "an open door on credibility and on expectation of payment" during the cross-examination. Specifically, the defendant sought to question Evans about a specific police officer by name and "one particular unit . . . within the Stamford Police Department." The court denied this request.

After the arguments concluded, the court observed that it needed to balance the defendant's right to confront Evans against public policy concerns, namely, the police department's need for information from confidential informants as well Evans' safety. Ultimately, the court ruled that the defendant could inquire as to the following: (1) "the fact that . . . Evans was engaged in criminal investigations"; (2) "how many investigations there were, over what period of time"; (3) "moneys received from the Stamford Police Department"; (4) "expectation [of financial reward] in this particular case"; and (5) "[any] other consideration, [if there was] . . . a good faith basis."

At trial, the defendant extensively cross-examined Evans. He established that Evans had worked as a confidential informant for the Stamford Police Department. When pressed by the defendant, Evans could not recall when he first worked as an informant for the Stamford police department, or on how many occasions he provided the police with information. Regarding compensation, Evans testified that he had been compensated only with "gas money," and was adamant that he had "never [taken] any money from [the police] besides [gas

money].'' Evans did concede that a member of the police department had "ripped up" a speeding ticket. Also, Evans testified that a police officer had written him a letter of recommendation in support of his bail enforcement agent license application.[13] Finally, when asked—on two separate occasions—whether he had been paid or expected to be paid in either money or some other form of compensation, Evans unequivocally answered in the negative.

The standard of review to determine whether a defendant's right of cross-examination has been unduly restricted is well settled. "The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . We must, therefore, conduct a two-step analysis, determining first whether the cross-examination permitted to defense counsel comported with sixth amendment standards . . . and second, whether the trial court abused its discretion in restricting the scope of that cross-examination. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Reeves*, 57 Conn. App. 337, 346, 748 A.2d 357 (2000).

"To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. . . . Once it is established that the trial court's ruling on the scope of cross-examination is not constitutionally defective, this court will apply [e]very reasonable presumption . . . in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) Id., 346–47.

Our analysis is also guided by the following principles. "The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Citations omitted; internal quotation marks omitted.) Id., 343–44. We are mindful that, "[g]enerally speaking, the [c]onfrontation [c]lause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware* v. *Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985).

Thus, "[i]n determining whether a defendant's right

of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Reeves*, supra, 57 Conn. App. 345–46.

The defendant's reliance on *State* v. *Santiago*, 224 Conn. 325, 618 A.2d 32 (1992), is misplaced. Our Supreme Court in *Santiago* held that the trial court had violated the defendant's constitutional right to confrontation by improperly limiting his cross-examination of one of the state's witnesses. Id., 326. The witness in that case was a former Hartford police officer who testified to knowing two of the detectives who responded to the shooting incident in which the murder at issue had occurred. Id., 330. When the defendant sought to question the witness "as to what relationship, if any, he presently had with the Hartford police department," the state objected and the court sustained the objection. Id. The court in *Santiago* concluded that the trial court "improperly prohibited inquiry into a legitimate area of cross-examination . . . [because] [i]t is always relevant to the issue of bias that a witness may have a relationship to the prosecuting authorities in a criminal case." Id., 332. Our Supreme Court further explained that because the witnesses' testimony was critical to the finding of guilt, the trial court's "improper limitation on the defendant's cross-examination . . . require[d] reversal . . . ." Id., 334. The facts of this case, however, are distinguishable and do not require a similar result.

Unlike the defendant in *Santiago*, the defendant here was allowed to inquire into Evans' past connections with the Stamford Police Department. Although Evans was uncertain as to when he first worked as a confidential informant and as to how many instances he did so, the defendant was allowed to cross-examine Evans on his previous work as a confidential informant for the Stamford Police Department. More importantly, the defendant elicited testimony that the Stamford Police Department, in the past, had bestowed Evans with favorable treatment by "ripp[ing] up" a speeding ticket, as well as providing him a letter of recommendation for his bail enforcement agent license application. As the sole trier of fact, the jury was free to believe Evans' claim that he received only "gas money" as compensation for his efforts as a confidential informant and that he had not been paid or expected compensation in connection with this case.

We conclude that the defendant's cross-examination of Evans satisfied the constitutional requirements. The record demonstrates that the defendant was given sufficient opportunity to cross-examine Evans regarding his motive and bias for testifying. The record is clear that

the defendant elicited a sufficient amount of information to aid the jury in assessing Evans' credibility. Thus, the jury was presented with sufficient facts from which it could determine the reliability of Evans' testimony.

Furthermore, the court did not unduly restrict the defendant's cross-examination of Evans. Thus, the court did not abuse its discretion in limiting the inquiry as it did. The court was faced with balancing the probative value of the evidence that could have been elicited from Evans against the state's public policy concerns, namely, the police department's need for information from confidential informants as well as ensuring Evans' safety. The court's ruling provided sufficient latitude for the defendant to cross-examine Evans on the "issues [that were] actually litigated at trial"; *State* v. *Reeves*, supra, 57 Conn. App. 346; by affording him the opportunity to inquire into Evans' relationship with the Stamford Police Department as evidenced by Evans' testifying to two occasions of favorable treatment.[14] Therefore, this argument must fail.

## IV

The defendant's final claim is that the court provided improper instructions to the jury. Specifically, he argues that the court failed to properly instruct the jury on the crime of attempt to commit murder and on the defense of entrapment. We address each in turn.

We first set forth the relevant law governing the defendant's improper jury instruction claim. The standard of review for claims of instructional impropriety is well established. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Griggs*, supra, 288 Conn. 124.

"We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amend-

ment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Internal quotation marks omitted.) Id., 125–26.

A

The defendant claims that the court's charge to the jury "lacked sufficient guidance . . . on what constitutes a 'substantial step' . . . ." Specifically, he argues that he was found guilty because the court did not "explicitly define and give examples" of what constitutes a "substantial step" by listing those examples provided in § 53a-49 (b).[15]

The following facts provide the context for this claim. After both parties submitted their requests to charge, the court provided the parties with the proposed charge for the attempt count at the charging conference. Defense counsel took a "strenuous exception," arguing that the proposed charge—by leaving out the specific examples provided in the statute—would confuse the jury because it could not "appreciate the level of proximity to the death of the victim and the severity of the conduct toward achieving that goal." As a result, the defendant argued, it would be a "miscarriage of justice not to read" the examples.

On appeal, the defendant relies on *State* v. *Washington*, 15 Conn. App. 704, 546 A.2d 911 (1988), for the proposition that he was "entitled to fact specific requests to charge, as well as a definition, or at least guidance from the trial court as to what does and what does not constitute a substantial step under the attempt statute." (Internal quotation marks omitted.) The state counters that the jury instruction was accurate and almost verbatim to the criminal jury instruction provided by the Judicial Branch; thus, the jury charge did not mislead the jury. Moreover, the state argues, it was within the court's discretion not to provide the examples listed in the statute. We agree with the state.

The defendant's contention that *State* v. *Washington*, supra, 15 Conn. App. 704, entitles him to his requested jury charge is faulty. The defendant in *Washington* argued on appeal that the court erred in reading § 53a-49 (b) in its entirety to the jury because only three of the seven listed examples were relevant to his case. Id., 708–709. Thus, the defendant contended, the jury was "misled and confused" when it had to consider irrelevant statutory examples because the instructions "invited [the jury] to consider theories of liability unsupported by the evidence." Id., 709. The court in *Washington* did not agree, noting that it had "no doubt that the

court's instructions . . . aided the jury in understanding the difficult concept of what constitutes a substantial step." (Internal quotation marks omitted.) Id., 710.

*Washington* holds that it is permissible, but not mandatory, for a court to read the "irrelevant statutory examples [provided in § 53a-49 (b)] . . . as illustrations" because those examples are not intended to be "various statutory bases of liability . . . ." Id. In the fourteen appellate decisions citing *Washington* as of the date of this opinion, not one suggests that it mandates courts to read the statutory examples provided in § 53a-49 (b). We decline the defendant's invitation to expand our holding in *Washington.*

We conclude that the charge was proper. The court's instructions mirrored the language of the statute.[16] See General Statutes § 53a-49 (a); see also *State* v. *Lo Sacco*, 11 Conn. App. 24, 29–30, 525 A.2d 977 (finding no error in jury charge when judge read statute verbatim), cert. denied, 204 Conn. 812, 528 A.2d 1158 (1987). Also, the charge was taken nearly verbatim from the criminal jury instruction provided by the Judicial Branch.[17] "This court has noted that [w]hile not dispositive of the adequacy of the [jury] instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis." (Internal quotation marks omitted.) *State* v. *Leandry*, supra, 161 Conn. App. 396–97. Moreover, the commentary to the jury instruction advises the court that it "may, if it so chooses, and if supported by the evidence, provide an example of what is a 'substantial step.' " Connecticut Criminal Jury Instructions (4th Ed. 2008) § 3.2-2, commentary (Rev. to December 1, 2007 [modified November 17, 2015]), available at http://jud.ct.gov/JI/Criminal/Part3/3.2-2.htm (last visited March 23, 2016).

The defendant's argument that the jury's deliberations were "clouded by speculation" because the court did not provide the statutory examples is itself speculative. "Jurors are expected to bring their common sense and common experience to the deliberation process." *State* v. *Padua*, 273 Conn. 138, 159, 869 A.2d 192 (2005). In applying its own reasoning, the jury reasonably could have concluded that the defendant's conduct, namely, "seeking a shooter, meeting with him to plan the murder of his [wife], and establishing a time later . . . to make the first of three payments pursuant to the defendant's plan," constituted more than mere preparation. The charge was proper and the jury was not misled. Therefore, this claim must fail.

B

The defendant next claims that the court provided an inadequate jury instruction on the defense of entrapment in contravention of General Statutes § 53a-15.[18]

The following facts are necessary to resolve this claim. Late on the sixth day of trial, after the court

provided both parties with a preliminary charge and discussed it in chambers, the court held a charging conference. At that time, the court acknowledged that the defendant was using entrapment as a defense. Specifically, the court noted that the defendant was arguing that because Evans was a bail enforcement agent and a previous confidential informant, he should be considered a "government agent for purposes of this prosecution." The following day, after the court read the entrapment charge to the jury,[19] the defendant objected on the ground that the court, in substituting "government agent or police officer" in its charge, would confuse the jury. The defendant argued that "public servant or by a person acting in cooperation with a public servant" should have been read throughout the charge. The state countered that the charge, as given, followed the model jury instruction and provided proper guidance to the jury. The court ruled that the charge, as given, was proper.

On appeal, the defendant makes a similar claim. Specifically, he argues that the jury charge was defective because it excluded Evans from the category of persons who may have "induced" the defendant to commit the crime. As characterized by the defendant, this charge was "constitutionally infirm [because] . . . [the] court's jury instruction unconstitutionally narrowed the breadth of the statute to exclude Evans." Thus, the defendant argues, the jury was misled. We disagree.

In resolving this final issue, we are guided by the following principles. "A defendant's right to present a defense is of constitutional dimension. Thus, [w]here the legislature has created a legally recognized defense . . . [due process requires] a proper jury instruction on the elements of the defense . . . so that the jury may ascertain whether the state has met its burden of disproving it beyond a reasonable doubt. . . . When the evidence presented at trial, construed in the light most favorable to the defendant, supports such a defense, a charge on the defense is obligatory." (Citation omitted; internal quotation marks omitted.) *State* v. *Riley*, 159 Conn. App. 462, 477–78, 123 A.3d 123, cert. denied, 319 Conn. 949, 125 A.3d 528 (2015).

Our review of the jury charge, read as a whole, leads us to conclude that it was proper. First, the court began its instruction by reading a nearly verbatim version of the statute on the defense of entrapment. Second, the charge followed the model jury instruction,[20] which we have stated is "a relevant and persuasive factor in our analysis." (Internal quotation marks omitted.) *State* v. *Leandry*, supra, 161 Conn. App. 397. Third and finally, the defendant provides no case law, nor did we find any Connecticut case, supporting his argument that the term "government agent or police officer" in the context of an entrapment charge misleads a jury. There are, however, Connecticut cases that use the term "govern-

ment agent" to explain our entrapment law. See *State* v. *Lee*, 229 Conn. 60, 79, 640 A.2d 553 (1994) ("[w]here the [g]overnment has induced an individual to break the law and the defense of entrapment is at issue . . . the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by [g]overnment agents" [internal quotation marks omitted]); *State* v. *Marquardt*, 139 Conn. 1, 5, 89 A.2d 219 (1952) ("if the evil intent and the criminal design originate in the mind of the government agent and the accused is lured into the commission of the offense charged . . . no conviction may be had"); *State* v. *Nero*, 122 Conn. App. 763, 784–85, 1 A.3d 184 (2010) ("[i]n their zeal to enforce the law . . . [g]overnment agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the [g]overnment may prosecute" [internal quotation marks omitted]). Thus, in this case, the jury instruction on the elements of the defense of entrapment was proper and did not mislead the jury. Accordingly, the defendant's final argument must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interest of the victim of a criminal violation of a protective order, we decline to identify the victim or others through whom the victim's identity may be ascertained.

[1] The men were acquainted because Evans previously had been a confidential drug informant and worked with Evensen in his capacity as a police officer.

[2] A criminal protective order was issued against the defendant on March 7, 2011. It is not a part of this appeal.

[3] In his reply brief, the defendant contends for the first time that the evidence did not demonstrate that he acted with the "specific intent to cause the death of his spouse." Because "[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief"; (internal quotation marks omitted) *State* v. *Peeler*, 271 Conn. 338, 373 n.36, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); we decline to address this claim. See also *State* v. *Jose G.*, 102 Conn. App. 748, 755, 929 A.2d 324 (2007) ("Claims of error by [the defendant] must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the [state] in its brief, and so that we can have the full benefit of that written argument. Although the function of the [defendant's] reply brief is to respond to the arguments and authority presented in the [state's] brief, that function does not include raising an entirely new claim of error." [Internal quotation marks omitted.]), aff'd, 290 Conn. 331, 963 A.2d 42 (2009).

[4] Although the defendant stated that he could get the $800 that night, he was hesitant to do so because "for [him] to get it, [he] had to . . . disturb people, [and] [he did not] want to [do] anything out of place [that night]." The defendant assured Paleski that he could get the money the following day "without doing anything . . . out of character."

[5] At Paleski's behest, the defendant provided the following information on a piece of paper: (1) the victim's name; (2) the color, make, and model of the victim's car; (3) the victim's place of employment; and (4) the victim's home address.

[6] The colloquy discussing his wife's photograph was as follows:

"[Paleski]: [Y]ou . . . have a picture of her or anything?

"[The Defendant]: I do have a little bit older [picture because] she's not fucking big on pictures. . . .

"[Paleski]: [T]hat's a picture . . . of her, that's how she looks now?

"[The Defendant]: [U]h, her hair is more mixed in colors.

"[Paleski]: [W]hat color?

"[The Defendant]: [S]he got all fucking crazy highlights . . . like brown and blond and a little bit of black."

[7] For example, from our Supreme Court one can compare *State* v. *Lapia*, supra, 202 Conn. 515 (focus is on "what the actor has *already done* and not on what remains to be done" [emphasis in original]), with *State* v. *Green*, 194 Conn. 258, 277, 480 A.2d 526 (1984) ("[the substantial step] standard shifts the focus from what has been done to what remains to be done"), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

From this court's case law, one can compare *State* v. *Hanks*, supra, 39 Conn. App. 341 ("To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. . . . This standard focuses on what the actor has already done and not [on] what remains to be done. *State* v. *Lapia*, [supra, 202 Conn. 515]." [Citation omitted; internal quotation marks omitted.]), with *State* v. *Campfield*, 44 Conn. App. 6, 25, 687 A.2d 903 (1996) ("[Section] 53a-49 [a] [2] requires an accused to have undertaken a substantial step toward committing the intended crime. This standard focuses on what act remains to be done to commit the intended crime and not what acts have been done."), cert. denied, 240 Conn. 916, 692 A.2d 814, cert. denied, 522 U.S. 823, 118 S .Ct. 81, 139 L. Ed. 2d 39 (1997).

We also take this opportunity to correct a misapplication of a legal principle as enunciated in *Campfield*. In that case, this court cited to *Hanks* for the proposition that the substantial step "standard focuses on what act remains to be done to commit the intended crime and not what acts have been done." *State* v. *Campfield*, supra, 44 Conn. App. 25. The court in *Campfield*, however, appears to have misspoken when citing *Hanks*. The court in *Hanks*, quoting *State* v. *Lapia*, supra, 202 Conn. 515, explicitly stated that the substantial step "standard focuses on what the actor has already done and not what remains to be done." (Internal quotation marks omitted.) *State* v. *Hanks*, supra, 39 Conn. App. 341.

[8] Section 5.01 of the Model Penal Code provides in relevant part: "(1) Definition of Attempt. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

"(a) purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or . . .

"(c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(2) Conduct That May Be Held Substantial Step Under Subsection (1) (c). Conduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ." Model Penal Code and Commentaries, supra, § 5.01 (1) and (2), pp. 295–96.

[9] A review of our Supreme Court's case law reveals that the majority of cases follow the Model Penal Code formulation. Compare *State* v. *Wilcox*, 254 Conn. 441, 469, 758 A.2d 824 (2000) (focusing on what actor has done and not what remains to be done as applied to facts of case), *State* v. *Milardo*, 224 Conn. 397, 404, 618 A.2d 1347 (1993) (same), *State* v. *Anderson*, 211 Conn. 18, 27–28, 557 A.2d 917 (1989) (same), *State* v. *Lapia*, supra, 202 Conn. 515 ("[t]his standard differs from other approaches to the law of criminal attempt in that it focuses on what the actor has *already done* and not on what remains to be done" [emphasis in original]), and *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) (focusing on what actor has done and not what remains to be done as applied to facts of case), with *Small* v. *Commissioner of Correction*, 286 Conn. 707, 730, 946 A.2d 1203 ("[t]his standard shifts the focus from what has been done to what remains to be done" [internal quotation marks omitted]), cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008), and *State* v. *Green*, supra, 194 Conn. 277 (same).

This court's jurisprudence provides a similar result. Compare *State* v. *Carter*, 141 Conn. App. 377, 387, 61 A.3d 1103 (2013) (focusing on what actor has done and not what remains to be done as applied to facts of case), aff'd, 317 Conn. 845, 120 A.3d 1229 (2015), *State* v. *Osbourne*, supra, 138 Conn. App. 528 ("[t]his standard focuses on what the actor has already done and not what remains to be done" [internal quotation marks omitted]), *State* v. *Robinson*, 127 Conn. App. 1, 9, 15 A.3d 648 (focusing on what actor has done and not what remains to be done as applied to facts of case), cert. denied, 300 Conn. 942, 17 A.3d 477 (2011), *State* v. *Andrews*, 114 Conn. App. 738, 747–48, 971 A.2d 63 (same), cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009), *State* v. *Towns*, 114 Conn. App. 155, 161–62, 968 A.2d 975 (same), cert. denied, 293 Conn. 901, 975 A.2d 1278 (2009), *State* v. *Damato*, supra, 105 Conn. App. 345 (same), *State* v. *Fauntleroy*, 101 Conn. App. 144, 152,

921 A.2d 622 (2007) (same), *State* v. *Morocho*, 93 Conn. App. 205, 215, 888 A.2d 164 ("[t]his standard focuses on what the actor has already done and not what remains to be done" [internal quotation marks omitted]), cert. denied, 277 Conn. 915, 895 A.2d 792 (2006), with *State* v. *Campfield*, supra, 44 Conn. App. 25 (misspeaking when defining substantial step standard as stated in *State* v. *Hanks*, supra, 39 Conn. App. 341).

[10] We note that our Supreme Court has stated that the drafters of the Model Penal Code "belie[ved] that the proper concern of the law of attempts is the dangerousness of the actor, as a person manifesting a firm disposition to commit a crime, not the dangerousness of his conduct." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 181 n.29, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006); see also Model Penal Code and Commentaries, supra, § 5.01, comment (3) (b), pp. 315–16 ("[t]he law of attempts . . . should be concerned with manifestations of dangerous character as well as with preventive arrests"). With this principle in mind, it was reasonable for the jury to have concluded that a person, with the intent to commit murder who hires a hit man has demonstrated his dangerousness to society.

[11] The defendant also made two additional arguments in this claim. He contended that the court abused its discretion by limiting his cross-examination of Evans regarding a prior conviction and evidence that his wife allegedly operated an unlicensed day care. In crafting his argument, however, the defendant's main brief contained only four passing, conclusory statements regarding the prior conviction and unlicensed day care claims. We note that his reply brief also made no reference. We do not suggest that a minimum number of statements or references must be reached before we review a claim. We do, however, assert that "[a]nalysis, rather than mere abstract assertion[s], is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Pink*, 274 Conn. 241, 244 n.3, 875 A.2d 447 (2005); see also *State* v. *Wragg*, 61 Conn. App. 394, 395 n.1, 764 A.2d 216 (2001) ("[a]n issue merely mentioned will be deemed abandoned"). Accordingly, we decline to review the portion of the defendant's claim pertaining to Evans' prior conviction and the allegation that Evans' wife was operating an unlicensed day care.

[12] The defendant cited to *United States* v. *Leja*, 568 F.2d 493 (6th Cir. 1977). In that case, the government informant was employed by the federal Drug Enforcement Agency. Id., 498. With the agency's permission, the informant cooperated with the defendant to manufacture drugs and introduced the defendant to the undercover agent posing as a customer. Id., 494. At trial, the defendant elicited testimony from the informant that he had received a substantial monetary payment for his work in that case. Id., 495. The court, however, did not allow the defendant to cross-examine the informant on payments from past services. Id., 497.

The defendant argued on appeal that the informant "fabricated the facts of [the defendant's] involvement in order to collect the $1000 per head bounty offered by the government in addition to its regular retainer." Id., 495. In its analysis reversing the judgment of the District Court, the court in *Leja* calculated that the informant was "receiving payment at an annual rate of $42,000 and $56,000" in 1975. Id., 498. Therefore, the court in *Leja* reasoned that "surely the evidence of how much [the informant] was receiving from the government for past services and might therefore expect in the future was highly relevant to the question of his potential bias and interest." Id., 499.

The facts from *Leja* are easily distinguished. Evans was not acting as a *paid* informant in the present case. As testified by Evans, he neither received any form of payment nor expected any future payment or consideration. Evans also testified to being remunerated only for his fuel expenses when acting as a confidential informant, a very different situation from that of the informant in *Leja*, whose livelihood appeared substantially impacted by working as a government informant.

[13] During direct examination, it was established that Evans worked as a bail enforcement agent. On cross-examination, it was then established that a bail enforcement agent must be licensed in Connecticut. See General Statutes § 29-152f ("[a]ny person desiring to engage in the business of a bail enforcement agent shall apply to the Commissioner of Emergency Services and Public Protection for a license").

[14] The defendant's contention that the court's ruling limiting his cross-examination of Evans was harmful error is also without merit. Although Evans was a key witness for the prosecution, the jury had the benefit of reviewing the video recording the defendant's plot to have Paleski murder

his wife. Even had the jury not credited Evans' testimony, the video was compelling evidence of the defendant's guilt.

[15] The examples provided in § 53a-49 (b), in relevant part, are as follows: "Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) [l]ying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime."

[16] The court charged the jury, in relevant part, as follows: "Element two, conduct. The second element is that the defendant intentionally did anything that under the circumstances as he believed them to be was an act constituting a substantial step in the course of conduct planned to culminate in his commission of the crime of murder. To be a substantial step the conduct must be strongly corroborative of the defendant's criminal purpose.

"The state need not show that its conduct progressed so far as to constitute the final step in a course of conduct planned to culminate in the commission of a crime had the circumstances been as he believed them to be; however, the act or acts must constitute more than mere preparation.

"The defendant's conduct must be at least the start of a line of conduct that will lead naturally to the commission of a crime. In other words, it must appear to the defendant that it was at least possible that the crime of murder could be committed if he continued on his course of conduct.

"You may recall the state's claim that the defendant's conduct between the afternoon of—mid-afternoon of June 9, 2011, and morning of June 10 rose to the level of substantial steps, including seeking a shooter, meeting with him to plan the murder of [his wife] and establishing a time later in the morning of the tenth to make the first of three payments pursuant to the defendant's plan.

"However, you will also recall that the defendant claims that the state has failed to prove each element of the crime of attempted murder beyond a reasonable doubt in that the defendant neither possessed the specific intent to commit the murder, nor did he perform a substantial step before his arrest.

"If, upon all of the evidence, you conclude beyond a reasonable doubt that the defendant had formed in his mind a specific intention of murder as it has been defined for you, you must next consider whether he intentionally did anything that would constitute a substantial step toward the commission of that crime.

"In other words, the state must prove both the specific intent to commit murder and substantial conduct beyond a reasonable doubt in order to obtain a conviction.

"If you unanimously find that the state has proven beyond a reasonable doubt that the defendant intended to commit the crime of murder and took a substantial step toward the commission of that crime, then you shall find the defendant guilty. On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt either of these elements, you shall then find the defendant not guilty."

[17] Section 3.2-2 of the Connecticut Criminal Jury Instructions provides in relevant part: "The second element is that the defendant intentionally did anything that, under the circumstances as (he/she) believed them to be, was an act constituting a substantial step in a course of conduct planned to culminate in (his/her) commission of the crime of <insert substantive offense>. To be a substantial step, the conduct must be strongly corroborative of the defendant's criminal purpose. The act or acts must constitute more than mere preparation. The defendant's conduct must be at least the start of a line of conduct that will lead naturally to the commission of a crime. In other words, it must appear to the defendant that it was at least possible that the crime could be committed if (he/she) continued on (his/her) course of conduct. . . .

"If, upon all the evidence, you conclude beyond a reasonable doubt that

the defendant had formed in (his/her) mind the intention to commit <insert substantive crime> as it has been defined for you, you must next consider whether (he/she) intentionally did anything that would constitute a substantial step towards the commission of the crime. In other words, the state must prove both intent and conduct beyond a reasonable doubt to obtain a conviction.

"If you unanimously find that the state has proved beyond a reasonable doubt that the defendant intended to commit <insert substantive crime> and took a substantial step toward the commission of that crime, then you shall find the defendant guilty. On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt either of these elements, you shall then find the defendant not guilty." (Emphasis omitted; footnote omitted.) Connecticut Criminal Jury Instructions (4th Ed. 2008) § 3.2-2 (Rev. to December 1, 2007 [modified to November 17, 2015]), available at http://jud.ct.gov/JI/Criminal/Part3/3.2-2.htm (last visited March 23, 2016).

[18] General Statutes § 53a-15 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct."

[19] The court's charge of entrapment, in its entirety, is as follows: "Now, I'll discuss entrapment. The evidence in this case raises the issue of the defense of entrapment as it relates to the crime of attempted murder in count one.

"The statute defining entrapment reads in pertinent part. In any prosecution for an offense, it shall be a defense that the defendant engaged in the prescribed conduct because he was induced to do so by a *public servant or by a person acting in cooperation with a public servant* for the purpose of institution of criminal prosecution against the defendant and the defendant did not contemplate and would not otherwise have engaged in such conduct.

"Entrapment exists only if the defendant was not predisposed to committing the crime of attempted murder. If the criminal intent or the willing disposition to commit the crime originates in the mind of the defendant and the criminal offense is completed, it is no defense that the opportunity is furnished or that the defendant is aided in the commission of the crime in order to secure the evidence necessary to prosecute the defendant.

"On the other hand, it is entrapment if the criminal design originates in the mind of the *government agent or police officer* and the defendant is induced into the commission of the offense when the defendant would not have committed it except for the urging of the *government agent or officer*.

"The vital factor in determining if there has been entrapment is whether the defendant was induced by the urging of a *governmental agent or police officer* to commit a crime that the defendant would not otherwise have committed.

"Inducement means more than a simple request by a *governmental agent or police officer* to break the law. There is a clear distinction between inducing a person to commit a crime and setting the stage to catch that person in the execution of criminal designs of the person's own volition.

"If the *government agent or officers of the law* induce an innocent person to commit a crime that that person would not otherwise commit, it is entrapment and a defense to the crime charged.

"It is for you to determine on the basis of all the evidence whether the state has proven beyond a reasonable doubt that it did not induce the defendant to commit the offense for which he is charged in count one.

"If you unanimously find that the state has proved all of the elements of the crime of attempted murder beyond a reasonable doubt and have proved the claim of entrapment—disproved the claim of entrapment, excuse me, beyond a reasonable doubt, you must return a verdict of guilty on this count.

"If you unanimously find that the state has failed to prove one or more of the elements of the crime of attempted murder or failed to disprove the claim of entrapment, you must return a verdict of not guilty on this count." (Emphasis added.)

[20] The model jury instruction provides in relevant part: "Entrapment exists only if the defendant was not predisposed to committing the crime at issue. If the criminal intent or the willing disposition to commit the crime originates in the mind of the defendant and the criminal offense is completed, it is no defense that the opportunity is furnished or the defendant is aided in the commission of the crime in order to secure the evidence necessary to

prosecute the defendant. On the other hand, it is entrapment if the criminal design originates in the mind of the *government agent or police officer* and the defendant is induced into the commission of the offense when the defendant would not have committed it except for the urging of the *officer or government agent.*

"The vital factor in determining if there has been an entrapment is whether the defendant was induced by the urging of a *governmental agent or police officer* to commit a crime that the defendant would not otherwise have committed. Inducement means more than a simple request by a *government agent or police officer* to break the law. There is a clear distinction between inducing a person to commit a crime and setting the stage to catch that person in the execution of criminal designs of the person's own volition. If *officers of the law* induce an innocent person to commit a crime that that person would not otherwise commit, it is entrapment and a defense to the crime charged . . . ." (Emphasis added.) Connecticut Criminal Jury Instructions (4th Ed. 2008) § 2.7-4 Rev. to December 1, 2007 [modified to May 20, 2011]), available at http://jud.ct.gov/JI/Criminal/Part2/2.7-4.htm (last visited March 23, 2016).

---