STATE OF CONNECTICUT *v.* JAMES C. SERVELLO
(AC 18884)

Schaller, Spear and Pellegrino, Js.

Argued May 8—officially released August 15, 2000

*Jon L. Schoenhorn*, with whom, on the brief, was *Jeanne M. Zulick*, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's

attorney, and *Rosita M. Creamer*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, James C. Servello, appeals from a judgment of conviction, rendered following a jury trial, of attempt to commit arson in the second degree in violation of General Statutes §§ 53a-49[1] and 53a-112 (a) (2).[2] The defendant claims that (1) the trial court improperly denied his motion for a judgment of acquittal because the evidence was insufficient to support the jury's verdict of guilty of attempt to commit arson in the second degree, (2) the trial court improperly allowed the state to offer details of his prior arson conviction and other bad acts after ruling to exclude them, and (3) the prosecutor's offer of evidence contrary to the court's order violated his right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1992, David Shepack, assistant state's attorney, prosecuted the defendant for arson in the first degree, arson in the second degree, arson in the third degree, criminal mischief, two counts of tampering with a witness and conspiracy to commit arson. The defendant pleaded guilty under the *Alford* doctrine[3] to arson in

[1] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-112 (a) provides in relevant part: "A person is guilty of arson in the second degree when, with intent to destroy or damage a building . . . (2) a fire or explosion was caused by an individual hired by such person to start such fire or cause such explosion."

[3] "Under *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a criminal defendant is not required to admit his guilt, but consents to being punished as if he were guilty to avoid the risk of proceeding to trial. . . . A guilty plea under the *Alford* doctrine is a judicial oxymoron

the third degree and criminal mischief in the first degree, and was ultimately sentenced to thirteen years in prison to be served at the Osborn Correctional Institution (Osborn). The defendant was incarcerated throughout the events that are the subject of this appeal.

Following his sentencing, the defendant filed a petition for sentence review. The defendant submitted to the sentence review division an unsigned letter purported to be on the stationery of his defense counsel, stating that his sentence was to be for a term of six years suspended after four years. After reviewing the letter, Shepack informed the sentence review division that he believed that the document was fraudulent. The defendant later stated that Shepack had gone "beyond the scope of his functions as a prosecutor" in communicating his belief to the sentence review division.

In 1996, Donald Anderson, an inmate at Osborn, reported to William Grady, the supervisor of an intelligence unit at Osborn, that the defendant had asked him if he knew of anyone who could set fire to the Litchfield County courthouse, and to a prosecutor's house and car. Anderson's report was eventually communicated to the state police major crime squad in Litchfield. Trooper Deborah Schutt was assigned to investigate the defendant. Schutt met with Anderson and asked that he wear a tape recorder. Schutt told Anderson that she would assign an undercover trooper, Clifford Labbe, Jr., to pose as "Cliff DeMarco," a fictitious friend of Anderson with ties to the Mafia. Anderson then was to notify the defendant that he knew of someone willing to carry out his wishes. Timothy McIntosh, the administrative captain overseeing the prison facility, arranged for

in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 55 Conn. App. 243, 244–45 n.2, 739 A.2d 697 (1999), cert. denied, 253 Conn. 922, 754 A.2d 798 (2000).

Labbe, posing as DeMarco, to be added to the defendant's visiting list. Labbe visited the defendant on three occasions.

Taped recordings of the defendant's conversations with Anderson indicate that the defendant wanted the courthouse burned down, and that he wanted "someone from the outside" to set fire to the courthouse. The defendant stated that he needed only three days notice to locate the necessary funds. The defendant further stated that he would have Mary Jane Prescott, his girlfriend, deliver payment. Finally, the defendant stated that he would obtain Shepack's license plate number for use in locating Shepack's home.

During Labbe's first visit with the defendant on September 4, 1996, the defendant stated that he wanted Labbe to set fire to the courthouse and Shepack's car and residence. The defendant told Labbe that Prescott had control of his money and that she needed a power of attorney to retrieve the money from a safety deposit box. Labbe told the defendant that he required $5000 in advance and $5000 upon completion of the task, provided the defendant with his pager number and suggested that Prescott meet him at the Danbury Fair Mall to facilitate payment.

Labbe met with the defendant for the second time on October 2, 1996. During the meeting, Labbe stated that Prescott had not contacted him. The defendant responded that Prescott had paged him several times, but the pager number was not working. The defendant further stated that he had not given Prescott a power of attorney to access the safe deposit box. Prescott apparently was having difficulties accessing the safe deposit box because she had no key, but the defendant told Labbe that the issue had been resolved. The conversation concluded with the defendant's assuring Labbe that he would have his money in a few days and stating that he was trying to obtain Shepack's address. The

defendant then changed his instruction, stating that he wanted to pay Labbe all the money in advance. The defendant requested that, instead of burning Shepack's property, he wanted Shepack's house and car spray painted. Furthermore, Prescott contacted Labbe after the second visit and stated that "things hadn't panned out yet and that [he] needed to contact" the defendant.

During Labbe's third and final visit with the defendant on November 14, 1996, the defendant told Labbe to set fire to the courthouse, but stated that "he was having problems with a court injunction on his assets." There was, in fact, no injunction in place and the defendant had access to $19,000. The defendant was concerned by rumors that Anderson was recording conversations and was troubled by Anderson's early release.

During the trial, the state presented evidence as to the defendant's available assets, including bank statements, information about a safe deposit box and information pertaining to the defendant's investments. The documents indicated that the defendant had access to funds during the period in which his meetings with Labbe occurred. The documents also indicated that Prescott had a meeting scheduled with a locksmith on October 16, 1996, to have the safe deposit box lock drilled.

The jury heard recordings of conversations between the defendant and Prescott on August 25, September 1 and September 11, 1996. The transcript of a conversation between the defendant and Prescott on October 12, 1996, was admitted into evidence. In that conversation, the defendant instructed Prescott to page Labbe, whom he identified as an investigator he had hired, that she pretend that she had tried to contact him previously, and that she tell Labbe that "whatever you and [the defendant] discuss[ed] has not developed yet . . . [t]here [are] complications." The conversations further indicated that the defendant told Prescott to contact

Labbe and inform him that the plan could not go forward.

Correspondence seized included a note providing Labbe's alias and pager number and a note stating, "Cliff [Labbe] said to call him when you get things all set." A third note stated that "[o]f the things you and [the defendant] discussed, zero with a line thorough it, developed."

McIntosh, acting as notary public for the prison facility, notarized two documents for the defendant. One document gave power of attorney to Prescott, and a second allowed Prescott access to a safe deposit box. One of the documents restricted Prescott's authority to "open and enter [the defendant's] box to remove two titles for two automobiles . . . copy them front and back, and place back into [the defendant's] box the originals," and that "this draft/document shall be solely permitted for this one transaction only."

At the conclusion of the state's case, the defendant filed a motion for judgment of acquittal, which was denied. The jury found the defendant guilty of criminal attempt to commit arson in the second degree. On May 14, 1998, the defendant filed a motion for judgment of acquittal, which also was denied. Thereafter, the defendant pleaded guilty on a part B information to the charge of being a persistent serious felony offender. Additional facts will be discussed as necessary where relevant to the issues in this case.

I

The defendant claims first that the trial court improperly denied his motion for judgment of acquittal because the evidence was insufficient to support the jury's verdict of guilty of attempt to commit arson in the second degree. We disagree.

Specifically, the defendant claims that the evidence was insufficient to prove (1) that he had the requisite specific intent to have Labbe actually carry out the arson of the Litchfield courthouse and (2) that he committed a substantial step toward the commission of the crime. Both claims are without merit.

"When reviewing sufficiency of the evidence claims, we employ a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Walton*, 34 Conn. App. 223, 229, 641 A.2d 391, cert. denied, 230 Conn. 902, 644 A.2d 916 (1994).

With respect to the defendant's claim that the evidence was insufficient to establish specific intent, "[i]t is well established that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Smith*, 46 Conn. App. 321, 326, 699 A.2d 262 (1997).

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Romero*, 42 Conn. App. 555, 558, 681 A.2d 354, cert. denied, 239 Conn. 935, 684 A.2d 710 (1996).

To convict the defendant of attempt to commit arson in the second degree in violation of §§ 53a-112 (a) (2) and 53a-49 (a) (2), the state must prove beyond a reasonable doubt that the defendant acted with the specific intent to commit arson in the second degree, which, in turn, includes the intent to hire a person to cause a fire, and that the defendant took a substantial step in a course of conduct planned to culminate in his commission of the crime. "Intent may be inferred from the conduct of the accused and is a determination for the trier of fact. . . . That the evidence is circumstantial rather than direct does not diminish the force of that evidence. . . . The state must prove every essential element of the crime beyond a reasonable doubt and, while the jury may draw reasonable and logical inferences, it may not resort to speculation." (Citations omitted; internal quotation marks omitted.) *State* v. *Lavigne*, 57 Conn. App. 463, 469, 749 A.2d 60 (2000).

### A

The jury reasonably could have found that the defendant had the requisite specific intent to carry out the

arson. The state offered recordings of the defendant's conversation with Anderson evincing the defendant's hostility toward Shepack and the Litchfield courthouse for his original thirteen year prison sentence. The state further offered recordings of the defendant articulating a plan to Anderson and Labbe to target the Litchfield courthouse and Shepack's property. The recordings also indicated that Prescott would serve as a point of contact outside the walls of the prison and that she was capable of providing the funds for Labbe by means of a power of attorney executed by the defendant. Finally, the state offered documentary evidence seized from Prescott's apartment that supported her involvement in the defendant's affairs and her contact with a locksmith to access the safe deposit box. From the evidence presented and all the reasonable inferences that it yields, the jury reasonably could have concluded that the defendant possessed the requisite specific intent to carry out the arson.

## B

The defendant next claims that the evidence is insufficient to establish that his conduct constituted a substantial step toward hiring Labbe to commit an arson. "The legislature has defined what it meant by a substantial step in [General Statutes] § 53a-49 (a). It must be part of a course of conduct that is planned to culminate in the crime. The action taken must embody the intended crime, rather than being merely accidental or inadvertent. The [c]onduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) . . . unless *it is strongly corroborative of the actor's criminal purpose.* . . . General Statutes 53a-49 (b). [T]his standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime. *State* v. *Green,* 194 Conn. 258, 277, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). Accordingly,

the acts must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the [defendant] at least to be possible of commission by the means adopted." (Emphasis in original; internal quotation marks omitted.) *State* v. *Shinn*, 47 Conn. App. 401, 406, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998).

The arguments of both the state and the defendant focus on whether Labbe, Prescott or Anderson were "innocent agents" under § 53a-49 (b) (7). This subsection lists seven categories of conduct that, "if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law," including the "[solicitation of] an innocent agent to engage in conduct constituting an element of the crime." Because § 53a-49 is derived from § 5.01 of the American Law Institute's Model Penal Code, the model code comments are persuasive. See *State* v. *Wallace*, 56 Conn. App. 730, 735 n.7, 745 A.2d 216, cert. denied, 253 Conn. 901, 753 A.2d 939 (2000). The comments state that "[s]ubsection (2) also provides that the specific list of factors that has just been discussed does not preclude the possibility of finding an attempt in other contexts." American Law Institute, Model Penal Code and Commentaries (1985) part I, § 5.01, comment (6) (b) (viii), p. 347. The list therefore defines specific types of conduct that preclude a court from granting a directed verdict when that conduct is strongly corroborative of the actor's criminal purpose. See id., p. 297.

The pertinent question, therefore, is whether the defendant's actions equate to a substantial step toward hiring Labbe to commit an arson. We consider this question in the context of the circumstances as they appeared to the defendant at the time rather than how far the defendant ultimately was from hiring Labbe to carry out the arson. See General Statutes § 53a-49 (a).

Our Supreme Court has stated that the essential element of a hiring relationship is an "agreement to compensate the defendant for his services." *State* v. *McGann*, 199 Conn. 163, 176, 506 A.2d 109 (1986). In interpreting the relevant section pertaining to hiring an agent to carry out a murder, "we are concerned principally with adopting a construction . . . that effectuates the legislative intention, not with the technical niceties of contract law." Id., 178. Therefore, the mere fact that Labbe was not paid should not be dispositive.[4]

The defendant, relying on *State* v. *Schleifer*, 99 Conn. 432, 121 A. 805 (1923), claims that evidence that he solicited Labbe to set fire to a building cannot, as a matter of law, constitute a substantial step toward committing arson. The legislative history indicates that § 53a-112 was adopted to confront the problem of fires set to defraud insurance companies or those hiring persons to set such fires. See 19 H.R. Proc., Pt. 25, 1982 Sess., pp. 6195–96, remarks of Representative Alfred Onorato. In 1982, § 53a-112 was amended by No. 82-290 of the 1982 Public Acts (P.A. 82-290), which made it a crime to hire another person to set a fire. When the legislature amends the language of a statute, we presume that "it intended to change the meaning of the statute and to accomplish some purpose." *State* v. *Johnson*, 227 Conn. 534, 543, 630 A.2d 1059 (1993). It is therefore unlikely that the standard for attempted arson would be governed by the preamendment case law, which concluded that "the solicitation of another to commit arson . . . upon the offer of a bribe for so doing is a crime, by treating the offer of bribe as an

[4] The dictionary definition of "hire" does not state that payment is required. Hire is defined as "to engage the personal services of for a set sum"; "to engage the temporary use of for a fixed sum"; "to grant the personal services of or temporary use of for a fixed sum"; "to get done for pay"; or "to take employment." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

act constituting an attempt. Neither the letter nor the bribe constitutes such an act of endeavor as to make the crime one of attempt." *State* v. *Schleifer*, supra, 438. "[T]he mere offer of money, or solicitation, to commit arson is not the sort of act necessary to satisfy the definition." Id.

It is further presumed that "[w]hen the Legislature acts in a particular area, it does so with knowledge of and regard to the prior state of the law, including relevant decisions [of the Appellate Court]. . . . It is presumed to know the existing state of the case law in those areas in which it is legislating . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute." (Citations omitted; internal quotation marks omitted.) *State* v. *Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986). It is thus unlikely that the proscription of arson for "hire" under the amendment to § 53a-112 effected no corresponding change to the standard for attempted arson as stated in *Schleifer*.[5]

The jury reasonably could have found that the defendant attempted to hire Labbe to commit arson on the

---

[5] The defendant also claimed that the trial court improperly instructed the jury that it could find the defendant guilty of criminal attempt to commit arson if it found that the defendant attempted to hire Labbe to set fire to the courthouse and Shepack's residence. The trial court's instruction challenged by the defendant stated: "The attempt to hire someone to destroy or damage a building by fire or explosion might not have been completed, but the defendant's conduct must be strongly corroborative of his criminal intent. Preparation to commit a crime may constitute a criminal attempt if that preparation is a substantial step in a course of conduct leading naturally to the commission of the crime." The defendant's improper jury instruction claim is based, as was partially his insufficiency of evidence claim, on his belief that, under *Schleifer*, soliciting somebody to set a fire cannot, as a matter of law, constitute a substantial step toward the commission of arson. Because we conclude that *Schleifer* has been legislatively overruled by P.A. 82-290 to the extent that it held that solicitation of another to set a fire was insufficient to establish the crime of attempt to commit arson, we reject the defendant's improper jury instruction claim.

Litchfield courthouse and Shepack's house and car. Viewing the circumstances as they would have appeared at the time the defendant acted, the defendant offered to pay Labbe, a party apparently willing and able to carry out the procedure, $10,000. The defendant further offered to locate Shepack's address. Finally, there is evidence that the defendant utilized his girlfriend to contact Labbe and further evidence that she took steps to access the safe deposit box by scheduling an appointment with a locksmith to drill the lock after she received the power of attorney. The only point of controversy appears to be that Labbe had not actually been paid. To constitute a substantial step, however, consummation of the deed is not required. Any other interpretation would impose a requirement of a more stringent standard of proof for attempt than is provided by § 53a-49.

The defendant further posits that if the evidence was sufficient to establish attempted arson, the trial court improperly found that the evidence was insufficient to establish that he had renounced the attempt. We disagree.

"There are two relevant statutory provisions defining the elements of renunciation. Section 53a-49 (c) provides in part: 'When the actor's conduct would otherwise constitute an attempt . . . it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose.' [General Statutes §] 53a-50 elaborates on the voluntariness requirement as follows: 'For purposes of this part, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of

the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct or to transfer the criminal effort to another but similar objective or victim.' " *State* v. *Kelly,* 23 Conn. App. 160, 165, 580 A.2d 520, cert. denied, 216 Conn. 831, 583 A.2d 130 (1990), cert. denied, 499 U.S. 981, 111 S. Ct. 1635, 113 L. Ed. 2d 731 (1991).

The jury reasonably could have determined that the defendant failed to continue on his course of criminal conduct because of the circumstances of Anderson's early release and rumors that his conversations were being recorded. The defendant's renunciation, therefore, was not voluntary under General Statutes §§ 53a-49 and 53a-50, and the jury reasonably could have rejected the defense. The trial court thus properly denied the defendant's motion for judgment of acquittal.

## II

The defendant next argues that the trial court improperly allowed the state to offer details of his prior arson conviction and other bad acts after ruling to exclude them. We are not persuaded.

Prior to trial, the defendant filed a motion in limine to prevent admission of evidence of the defendant's criminal record and any charges pending at the time of the motion. The trial court ruled that the prosecutor was authorized to present evidence pertaining to the fact that the defendant was convicted in 1992, the date of that conviction, the fact that Shepack was the prosecutor for that conviction and the sentence the defendant received from the conviction. The court further stated that "at this point" the underlying facts of the conviction were more prejudicial than probative. The trial court, however, denied the motion in limine.

The trial court subsequently amended its ruling several times. First, the court allowed the state to present

evidence that "the defendant was convicted of the arson charge and not of a reckless burning charge, but at least at the initial stage, without indicating any of the underlying factual circumstances." Next, the court permitted evidence that the original arson conviction involved a car fire, finding the specific facts not prejudicial. The court also allowed evidence pertaining to the defendant's plea agreement. The court allowed the state to elicit testimony regarding the allegedly fraudulent letter as evidence of the defendant's motive. The trial court also admitted a tape recording of the defendant complaining that he was "the very first in the state of Connecticut that ever received this type of sentence, thirteen years, for car burning."

"It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design. . . . The test is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of such evidence must outweigh the prejudicial effect . . . . The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Evidence of prior threats by a defendant directed to his victim has been held relevant to the issues of intent and motive." (Citations omitted; internal quotation marks omitted.) *State* v. *Cepeda*, 51 Conn. App. 409, 430, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999). However, "[w]here the prior crime is quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be neces-

sary to warrant admissibility." *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982).

The evidence of prior misconduct admitted was relevant to the issues of intent and motive, which were central to this case. The state offered both the underlying facts of the arson conviction and the letter to the sentencing commission to establish the defendant's hostility toward Shepack. In deciding whether to admit the two incidents on the issues of intent and motive, the trial court applied the balancing test of probative value as against the prejudicial effect of such evidence. See *State* v. *Cepeda*, supra, 51 Conn. App. 431. The trial court properly decided that evidence involving the conviction for arson and the letter to the sentencing division were relevant to the issues of motive and intent, and it reasonably could have concluded that the probative value of such evidence outweighed its prejudicial tendency. Accordingly, the trial court did not abuse its discretion in admitting that evidence.

### III

The defendant claims next that the prosecutor's attempt to solicit testimony from Shepack regarding the details of the defendant's original charges after the trial court had initially ruled that such evidence was not admissible violated the defendant's right to a fair trial. The defendant seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[6] We conclude that the prosecutor's actions do not constitute misconduct.

---

[6] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

This court has declined to embrace a per se rule of prosecutorial misconduct when a prosecutor exceeds the bounds of a trial court's order. See *State* v. *Bonsu,* 54 Conn. App. 229, 239, 734 A.2d 596, cert. denied, 251 Conn. 909, 739 A.2d 1249 (1999). Instead, to determine "whether prosecutorial misconduct was so serious as to amount to a denial of due process [and is thus reviewable under *Golding*], this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are [1] the extent to which the misconduct was invited by defense conduct or argument . . . [2] the severity of the misconduct . . . [3] the frequency of the misconduct . . . [4] the centrality of the misconduct to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Aponte,* 50 Conn. App. 114, 126, 718 A.2d 36 (1998), rev'd in part on other grounds, 249 Conn. 735, 738 A.2d 117 (1999).

As discussed in part II of this opinion, the evidentiary issues raised by the prosecutor with respect to the prior arson conviction and Shepack's involvement with the letter to the sentencing division were central to proving the defendant's intent to commit arson. Moreover, the trial court's orders did not absolutely define the limits of the permissible evidence; instead, they appeared to provide working limitations subject to redefinition as the trial proceeded. In light of these considerations, we conclude that the defendant's claim that the prosecutor violated the court's order is not factually supported by the record. Because the defendant cannot satisfy the third *Golding* prong requiring him to establish that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial, further review is unwarranted.

The judgment is affirmed.

In this opinion the other judges concurred.