******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MIGUEL JUAREZ
(AC 38953)

DiPentima, C. J., and Lavine and Sheldon, Js.

*Syllabus*

Convicted of the crimes of conspiracy to commit murder and attempt to
commit murder in connection with his alleged conduct in attempting
to hire a hit man to kill his wife's boyfriend, F, the defendant appealed
to this court, claiming, inter alia, that there was insufficient evidence
to support his conviction. The defendant allegedly had offered to pay
Z, who formerly had been employed by the defendant, to kill F, but
when Z responded that he could not do it, the defendant asked him to
find someone who would kill F. Z then asked a friend, M, to kill F or
to find someone who would do so. M, a police informant, contacted the
police, who arranged a meeting between Z and a police officer who
posed as the hit man. During the meeting, Z provided the officer with
information about F and offered to pay the officer money to kill him.
*Held*:

1. The evidence was sufficient to support the defendant's conviction of
conspiracy to commit murder, as the defendant's offer to pay Z to kill
F was sufficient to prove the defendant's intent to enter into an
agreement with Z to have F killed; the defendant's conduct in the months
that followed that offer, which included hundreds of phone calls made
by the defendant to Z asking Z to follow his wife and whether Z had
found someone to kill F, was corroborative of the defendant's intent to
have F killed, and the jury reasonably could have concluded that the
defendant and Z knew who F was, even if they did not know his name,
as the evidence proved that the defendant had directed Z to F's house,
and that Z had seen F numerous times at various locations kissing and
hugging the defendant's wife.

2. There was sufficient evidence to support the defendant's conviction of
attempt to commit murder; on the basis of the defendant's offer to pay
Z to kill F, and his subsequent request that Z find someone else to kill
F when Z stated that he could not do it, the jury reasonably could have
inferred that the defendant intended to cause F's death, given the nature
and frequency of the defendant's communications with Z, it was reason-
able to infer that the defendant had solicited, requested, commanded,
importuned or intentionally aided Z to engage in an attempt to murder
F, and Z, by soliciting and ultimately hiring the police officer to kill F,
took substantial steps in a course of conduct that was planned to culmi-
nate in F's murder.

3. The defendant could not prevail on his claim that the state had failed to
prove the charges against him as they were set forth in the long form
information because he was not charged as an accessory in the attempt
count and the state did not prove that he engaged in any criminal conduct
during the relevant time period; the fact that the defendant was not
formally charged as an accessory did not preclude his conviction as
such and, thus, there was no merit to the defendant's challenge to his
conviction of attempt to commit murder as an accessory on the ground
that he was not charged as an accessory, and the defendant's claim that
there was no evidence that he had engaged in any criminal conduct on
the dates alleged in the information was unavailing, as the dates set
forth in the information clearly related to the period of time during
which Z was actively seeking an individual to kill F, as requested by
the defendant, the conduct of Z, a coconspirator, on those dates was
sufficient to support the guilty verdict on those charges, and the defen-
dant did not argue that he was prejudiced by the inclusion of the dates
in the information or that substantial injustice was done to him because
of the language of the information.

Argued October 24, 2017—officially released February 6, 2018

*Procedural History*

Substitute information charging the defendant with

the crimes of conspiracy to commit murder and attempt to commit murder, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the jury before *Hon. Richard F. Comerford, Jr.*, judge trial referee; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*A. Paul Spinella*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, former state's attorney, and *James M. Bernardi*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Miguel Juarez, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, and attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a. On appeal, the defendant claims that (1) the evidence adduced at trial was insufficient to support his conviction of either charge, and (2) the state failed to prove the charges of which he was convicted as they were set forth in its long form information. We affirm the judgment of the trial court.

The jury was presented with evidence of the following facts on which it could have based its verdict. In December, 2009, German Zecena approached the defendant and asked to borrow $300 from him because he was unemployed and his mother was sick. Zecena had worked for the defendant's landscaping company for two seasons prior to that date. The defendant gave Zecena the $300 that he asked for, and he asked Zecena to follow his wife "to see who she was seeing and if she was with a boyfriend or not." The defendant told Zecena that "he knew or he kind of knew that [his wife] had a boyfriend and, if that in fact was the case, then he was going to get a divorce." The defendant asked Zecena to go to the lower part of the Stamford Mall parking lot to see if the defendant's wife's car was there, and if she was there, to see if anybody was with her.

Thereafter, Zecena observed the defendant's wife at the mall "three or four times with the same person." Zecena witnessed the defendant's wife and that man, later identified as William Forte, kissing.[1] When Zecena told the defendant that he had witnessed his wife kissing another man at the mall, the defendant became upset and called his wife various names, using "curse words." Thereafter, in addition to sending Zecena to the mall to look for his wife, the defendant asked Zecena to drive by Forte's house, which was located in Greenwich, to see if his wife was there. When Zecena drove by Forte's house, he saw Forte sitting beside the defendant's wife on the stairs outside of the house. Zecena observed the couple talking, hugging and kissing. The defendant also instructed Zecena to look for his wife around the area of exit five on Interstate 95. At that location, Zecena saw the defendant's wife and Forte inside a car, talking, hugging and kissing. Zecena subsequently followed the defendant's wife, at the defendant's direction, five or six more times.

Zecena's relationship with the defendant continued into the spring of 2010, when Zecena started working for another landscaping company. In that time frame, at the defendant's request, Zecena would drive by Forte's house two or three times each week to see if the defendant's wife was there. Between February 22, 2010, and

June 19, 2010, the defendant called Zecena, on average, ten to fifteen times each day. Zecena did not answer most of those calls, but when he did speak to the defendant, "[the defendant] always asked . . . if [Zecena had] seen his wife, if [Zecena] had passed by the house where his wife's boyfriend lived."

At one point in the spring of 2010, Zecena met the defendant at a stone yard on Larkin Street in Stamford. In that meeting, after Zecena told the defendant that he had seen his wife with Forte, the defendant told Zecena that he would give him $5000 to kill Forte. When Zecena responded by telling the defendant that he did not have "sufficient courage" to kill Forte, the defendant asked Zecena to find someone else to kill Forte. Zecena agreed to find someone to kill Forte, although he testified that he "was going to ask [the defendant] for an additional $1000 . . . so that [he] could keep $500 for [him]self and then $500 for the other person that [he] was going to ask to find someone to do that job." The defendant thereafter called Zecena three or four times to receive updates as to Zecena's efforts to find someone to kill Forte.

On June 10, 2010, Zecena approached Luis Miranda, whom Zecena had known for several years through Miranda's work as a bouncer at a bar in Stamford. Zecena asked Miranda if he knew someone who would kill Forte, and he offered Miranda $5000 if he would kill Forte, or $500 if he would find someone else to do it. On or about June 17, 2010, Miranda called Zecena and told him that he had found someone to "do that job." Miranda set up a meeting between Zecena and the "hit man" for June 19, 2010. Zecena called the defendant and told him that he had found someone to kill Forte, to which the defendant responded, "[t]hat['s] very well . . . go speak with that person." Zecena told the defendant that he "was going to interview . . . that guy" himself.[2]

Miranda was a police informant who regularly dealt with Stamford Police Officer Raphael Barquero. Miranda contacted Barquero to report the substance of his June 10, 2010 conversation with Zecena. Barquero told Miranda to try to get additional information from Zecena. To that end, Miranda called Zecena on or about June 14, 2010. Miranda testified that when Zecena had confirmed to him that he wanted to "go forward and talk to someone who would kill someone for him," Miranda told Zecena, at Barquero's instruction, that he would find someone to kill Forte. Barquero told Miranda that he would find another officer to pretend to be "a contract killer."

On June 19, 2010, at about 4:30 or 5:30 p.m., Miranda called Zecena. Zecena told Miranda to "meet [off] exit five in front of CVS" in a shopping center in Greenwich. After that call, both Miranda and Detective Frederick Quesada of the Greenwich Police Department, the offi-

cer who would pretend to be the "contract killer," travelled to the location specified by Zecena. Upon arriving at the CVS parking lot, Miranda exited his car and looked around for Zecena. When he saw Zecena, he introduced Zecena to Quesada as the man who was "going to do the job."

Upon meeting, Zecena and Quesada decided to talk in Quesada's car. Zecena "asked [Quesada] if he could kill a person." Zecena told Quesada that he wanted him to kill Forte because Forte owed him a lot of money.[3] Quesada agreed to kill Forte. Zecena told Quesada that Forte lived "right around the corner" from where they were talking in the CVS parking lot and suggested that they drive to Forte's house. Quesada agreed and Zecena directed him to Forte's house, pointing out both his house and his car, a blue Volvo. Zecena told Quesada that, although Forte lived alone, he had frequently observed a ninety year old woman at Forte's house, whom he presumed to be Forte's mother. Zecena described Forte to Quesada as tall, bald and chubby. Zecena told Quesada that Forte did not leave his house often because he is "getting up in years." After driving through Forte's neighborhood, Zecena and Quesada stopped at a liquor store to buy some beer, which they drank while they talked. Throughout the course of their discussions, Zecena repeatedly told Quesada that he would like to know when Quesada intended to do the job because he wanted to be sure to have the money ready to pay Quesada when the job was done. Quesada indicated that he would do it either that night or the next night. During his meeting with Quesada, Zecena called the defendant. The defendant told Zecena that he was in a meeting and thus could not talk to him, but that he would call him back in thirty minutes. When Quesada and Zecena returned to the CVS parking lot, Quesada asked Zecena if he had "something [he] could use" to kill Forte. Zecena gave him a knife that he carried in his truck for work. Zecena also gave Quesada $80, with the promise of another $420 in "half an hour, an hour." Zecena told Quesada that he would call him when he got the $420, and Quesada stated that he would remain in the area to wait for his call and also to watch Forte's house. Zecena left the CVS parking lot to go home, but he was pulled over and arrested.

Following an investigation, the defendant also was arrested and charged with conspiracy to commit murder and attempt to commit murder. The defendant was convicted of both charges, after a jury trial, and the court thereafter imposed a total effective sentence of twenty years incarceration, execution suspended after eight years, and five years probation. This appeal followed.

I

The defendant first challenges the sufficiency of the evidence presented at trial to sustain his conviction.

We begin by recognizing that "[a] defendant who asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Leandry*, 161 Conn. App. 379, 383, 127 A.3d 1115, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015). "As to the standard of review for this claim, this court applies a two part test. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the verdict. . . . [Second, we] . . . determine whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . .

"The law relevant to an insufficiency of the evidence claim teaches that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . We, however, are mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citations omitted; internal quotation marks omitted.) *State* v. *Daniel B.*, 164 Conn. App. 318, 325–26, 137 A.3d 837, cert. granted on other grounds, 323 Conn. 910, 149 A.3d 495 (2016). With these principles in mind, we turn to the defendant's claims of insufficiency.

A

The defendant claims that the evidence adduced at trial was insufficient to sustain his conviction of conspiracy to commit murder. Specifically, the defendant claims that the only evidence offered by the state of an agreement between him and Zecena was his initial offer to pay Zecena $5000 to kill Forte, and that that statement was "simply talk in the air, with no evidence of any discussion [of] who the victim was, and any details about how his murder would occur."[4] We are not persuaded.

"To prove the crime of conspiracy, in violation of § 53a-48, the state must establish beyond a reasonable doubt that an agreement existed between two or more persons to engage in conduct constituting a crime and that subsequent to the agreement one of the conspirators performed an overt act in furtherance of the conspiracy. . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Here the crime underlying the conspiracy is murder. Intent to cause the death of a person is an element of the crime [of murder] and must be proved beyond a reasonable doubt. . . . Intent may, however, be inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . .

"The existence of a formal agreement between parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement. . . . . Rather, [t]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . .

"[T]he size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends. . . . Participation in a single act in furtherance of the conspiracy is enough to sustain a finding of knowing participation." (Citations omitted; internal quotation marks omitted.) *State* v. *Balbuena*, 168 Conn. App. 194, 200–201, 144 A.3d 540, cert. denied, 323 Conn. 936, 151 A.3d 384 (2016).

Here, the defendant's claim that his offer to Zecena of $5000 to kill Forte was "simply talk in the air" is belied by the record. Zecena's testimony that the defendant made that offer to him is sufficient to prove the defendant's intent to enter into an agreement with Zecena to have Forte killed. The defendant's conduct in the months that followed that initial statement—the hundreds of phone calls that he made to Zecena asking him to follow his wife and to ascertain whether he had found someone to kill Forte—was corroborative of his intent to have Forte killed.

We also reject the defendant's claim that the state

failed to prove that he intended to enter into a conspiratorial agreement with Zecena to kill Forte because the defendant "had no idea who the intended victim was . . . ." Although neither the defendant nor Zecena knew Forte's name until Zecena was arrested, the evidence adduced at trial proved that the defendant directed Zecena to Forte's house, that Zecena had seen the defendant's wife at Forte's house, and that Zecena had seen Forte numerous times at various locations kissing and hugging the defendant's wife.

On the basis of the foregoing, the jury reasonably could have concluded that the defendant intended to enter into an agreement with Zecena to kill his wife's boyfriend, and that he and Zecena knew who her boyfriend was, even if they did not know his name. We thus conclude that the evidence adduced at trial was sufficient to support the jury's guilty verdict on the charge of conspiracy to commit murder.

B

The defendant also claims that the evidence was insufficient to sustain his conviction of attempt to commit murder. Specifically, the defendant claims that the evidence was insufficient to prove that he had intended to cause Forte's death or had engaged in any conduct that could be construed as a substantial step in a course of conduct planned to culminate in the murder of Forte. We disagree.

Section 53a-54a (a) defines murder, in relevant part, as follows: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." Section 53a-49 (a) defines criminal attempt, in relevant part, as follows: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does . . . anything which, under the circumstances as he believes them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Section 53a-49 (b) provides in relevant part: "Conduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ."[5]

"[T]he standard for the substantial step element of criminal attempt focuse[s] on what the actor has already done and not what remains to be done. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime. . . . What constitutes a substantial step in any given case is a question of fact. . . . [T]he ultimate measure of the sufficiency of the defendant's conduct to constitute a substantial step in a course of conduct planned to culminate in the commission of [a crime] is not, to reiterate, how close in time or place or final execution

his proven conduct came to the consummation of that crime, but whether such conduct, if at least the start of a line of conduct leading naturally to the commission of the crime, strongly corroborated his alleged criminal purpose." (Internal quotation marks omitted.) *State* v. *Daniel B.*, supra, 164 Conn. App. 331.

In this case, the jury was instructed that the defendant could be found guilty of attempt to commit murder as an accessory. "[Section] 53a-8 (a) provides: A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . . To convict a defendant of a crime on the theory of accessorial liability under this statute, the state must prove both that a person other than the defendant acting as a principal offender, committed each essential element of that crime, and that the defendant, acting with the mental state required for the commission of that crime, solicited, requested, commanded, importuned or intentionally aided the principal offender to engage in the conduct constituting that crime. Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] . . . did some act which . . . directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Citation omitted; internal quotation marks omitted.) *State* v. *Raynor*, 175 Conn. App. 409, 426–27, 167 A.3d 1076, cert. granted on other grounds, 327 Conn. 969,     A.3d     (2017). Thus, in this case, to prove the defendant guilty of violating §§ 53a-49 and 53a-54a, the state had to prove beyond a reasonable doubt that the defendant or Zecena, with the intent to cause the death of Forte, committed an act that was a substantial step aimed at achieving his death.

Here, on the basis of the defendant's offer to Zecena of $5000 to kill Forte, and his subsequent request that Zecena find someone else to kill Forte when Zecena stated that he did not have the courage to kill Forte himself, the jury reasonably could have inferred that the defendant intended to cause Forte's death. In addition to that initial meeting between the defendant and Zecena, the jury also heard that the defendant repeatedly asked Zecena to follow his wife and directed Zecena to various locations where he suspected Zecena might find his wife with Forte, including Forte's home in Greenwich. The defendant called Zecena hundreds of times in the early months of 2010 to ask Zecena if he had followed his wife, if he had seen his wife with Forte, and if he had found anyone to kill Forte. Zecena also testified that he called the defendant when Miranda informed him that he had found a hit man and that the

defendant responded, "very well . . . ." Given the nature and frequency of his communications with Zecena, it is reasonable to infer that the defendant "solicited, requested, commanded, importuned or intentionally aided Zecena" to engage in the attempt to murder Forte. Moreover, by soliciting and ultimately hiring Quesada to kill Forte, Zecena took substantial steps in a course of conduct planned to culminate in the murder of Forte.[6] We thus conclude that the evidence was sufficient to sustain the defendant's conviction of attempt to commit murder.

## II

The defendant finally claims that the state did not prove that he committed the offenses of which he was convicted in substantially the manner described in the information. Specifically, the defendant argues that the state failed to charge him with attempt to commit murder as an accessory, that the information pointed only to the dates of May and June, 2010, and that it was not proven that he had engaged in any criminal conduct during that time period. We reject the defendant's claims.

"[G]enerally speaking, the state is limited to proving that the defendant has committed the offense in substantially the manner described in the information. . . . Despite this general principle, however, both this court and our Supreme Court have made clear that [t]he inclusion in the state's pleading of additional details concerning the offense does not make such allegations essential elements of the crime, upon which the jury must be instructed. . . . Our case law makes clear that the requirement that the state be limited to proving an offense in substantially the manner described in the information is meant to assure that the defendant is provided with sufficient notice of the crimes against which he must defend. As long as this notice requirement is satisfied, however, the inclusion of additional details in the charge does not place on the state the obligation to prove more than the essential elements of the crime." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Vere C.*, 152 Conn. App. 486, 527, 98 A.3d 884, cert. denied, 314 Conn. 944, 102 A.3d 1116 (2014).

"[A] defendant can gain nothing from [the claim that the pleadings are insufficient] without showing that he was in fact prejudiced in his defense on the merits and that substantial injustice was done to him because of the language of the information. . . . To establish prejudice, the defendant must show that the information was necessary to his defense, and not merely that the preparation of his defense was made more burdensome or difficult by the failure to provide the information." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Caballero*, 172 Conn. App. 556, 566, 160 A.3d 1103, cert. denied, 326 Conn. 903, 162 A.3d 725 (2017).

Although the state did not specifically charge the defendant in the long form information as an accessory to the crime of attempt to commit murder, it is well established that "a defendant may be convicted as an accessory even though he was charged only as a principal as long as the evidence presented at trial is sufficient to establish accessorial conduct." (Internal quotation marks omitted.) *State* v. *James*, 247 Conn. 662, 679, 725 A.2d 316 (1999); see *State* v. *Vasquez*, 68 Conn. App. 194, 215, 792 A.2d 856 (2002) (defendant charged with crime is on notice that he may be convicted as accessory to that crime). "Therefore, the fact that the defendant was not formally charged as an accessory does not preclude his being convicted as such . . . and a defendant who is charged with an offense should be on notice that he may be convicted as an accessory." (Internal quotation marks omitted.) *State* v. *VanDeusen*, 160 Conn. App. 815, 848–49, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015). The defendant's challenge to his conviction of attempt to commit murder as an accessory on the ground that he was not charged as an accessory is thus without merit.

We also reject the defendant's claim that the evidence adduced at trial was insufficient to prove his guilt of either of the charges of which he was convicted in substantially the manner described in the information because there was no evidence that he engaged in any criminal conduct on the dates alleged in the information. The defendant's claim in this regard fails for two reasons. First, the dates set forth in the information— "the months of May and June" on the conspiracy charge, and June 19, 2010, on the attempt charge—clearly relate to the period of time during which Zecena was actively seeking an individual to kill Forte, as requested by the defendant. The conduct of Zecena on those dates, as a coconspirator and the principal on the attempted murder charge, was sufficient to support the guilty verdict on those charges. Moreover, the defendant has not argued that he has been prejudiced by the inclusion of the dates in the information or that "substantial injustice was done to him because of the language of the information." (Internal quotation marks omitted.) *State* v. *Caballero*, supra, 172 Conn. App. 566. At trial, the defendant steadfastly denied any knowledge or involvement in a conspiracy or attempt to murder Forte. The defendant has not demonstrated, or even claimed, that the dates included in the information thwarted the preparation of that defense.

On the basis of the foregoing, the defendant's claim that the state failed to prove his guilt in substantially the same manner in which he was charged in the state's information is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Neither Zecena nor the defendant knew Forte's name until they were

arrested.

[2] Zecena testified that at no time did the defendant tell him that he had changed his mind and no longer wanted Zecena to find someone to kill Forte.

[3] Zecena testified at trial that this was a lie.

[4] The defendant also claims that the evidence was insufficient because Zecena was the only one who testified that the defendant made that statement and he was not a credible witness. It is axiomatic that a challenge to the credibility of a witness is not a valid ground on which to base a claim of evidentiary insufficiency.

It is noteworthy that the defendant testified on his own behalf and that the jury thus had the opportunity to assess his credibility as well as Zecena's.

[5] General Statutes § 53a-49 (b) also provides: "Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime."

The defendant's offer to give Zecena $5000 to kill Forte, followed by his request that Zecena find someone who would kill Forte, would have been sufficient to constitute a substantial step in a course of conduct planned to culminate in the murder of Forte pursuant to § 53a-49 (b) (7). The state, however, did not rely on the defendant's offer to Zecena as the substantial step required to prove his guilt.

[6] The fact that Zecena paid Quesada only $80 does not undermine our conclusion. See *State* v. *Servello*, 59 Conn. App. 362, 373, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000). "To constitute a substantial step, however, consummation of [paying the hit man] is not required. Any other interpretation would impose a requirement of a more stringent standard of proof for attempt than is provided by § 53a-49." Id., 375.